**Opinion filed May 8, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-24-00257-CR

_____

## QUINCY LAMAR HENRY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 118th District Court**

**Howard County, Texas**

**Trial Court Cause Nos. 16509 & 16544**

### M E M O R A N D U M   O P I N I O N

The jury convicted Appellant, Quincy Lamar Henry, of capital murder and aggravated assault with a deadly weapon.[1]  *See* TEXAS PENAL CODE ANN. § 19.03(a)(7) (West Supp. 2025), § 22.02(a)(2) (West 2026).  Because the State

---

[1]Appellant has appealed from each judgment of conviction that were originally docketed in our court as two separate appeals.  Pursuant to our inquiry and following Appellant's request, our Cause No. 11-24-00258-CR was consolidated into Cause No. 11-24-00257-CR for purposes of appeal.

waived the death penalty, the trial court assessed Appellant's punishment at confinement for life without the possibility of parole for the capital murder conviction. PENAL § 12.31(a)(2) (West 2019), § 19.03(b). For the aggravated-assault conviction, the jury assessed his punishment at confinement for forty years. The trial court sentenced him accordingly and ordered the sentences to be served concurrently in the Correctional Institutions Division of the Texas Department of Criminal Justice.

In three issues, Appellant asserts that the evidence is insufficient to support his conviction for capital murder, that the trial court erred by refusing to instruct the jury on the lesser-included offenses of manslaughter and non-capital murder, and that the trial court erred in handling a jury request to read back testimony during deliberation. We affirm.

## I. *Factual and Procedural History*

On the evening of November 17, 2022, Christopher Warren was outside of his home, retrieving tools from his vehicle, when he heard gunshots. Shortly after, Warren saw Appellant walking down the alleyway adjoining his neighbor Richard Lyons's apartment. Not wanting to get involved, when Appellant mentioned hearing something while making his way toward Warren, Warren responded that he believed his neighbor was "building a closet." Warren then went inside his home and retrieved his wife, who was awakened by the sound of gunshots. After they departed from their residence, Warren's wife called the police. A video recording captured on Warren's home security camera was admitted into evidence at trial. Gunshots can be heard going off moments before Appellant is seen exiting the alleyway.

Big Spring Police Department officers arrived at Lyons's residence and found two deceased men, later identified as Edward Martinez and Don Brooks, in the living room. The residence was otherwise unoccupied. Officers later learned that an

2

individual suffering from a gunshot wound was being treated at a nearby hospital. The individual was identified as Crystal Mesler.

At trial, Mesler testified that she had been living at Lyons's residence in November 2022. Jarron Vanderbilt and Brooks had also been living there at the time. Mesler described Lyons as a "very kind, sweet" elderly gentleman who often opened his home to people. On November 17, 2022, Appellant came over to Lyons's home. Mesler testified that when Appellant first arrived, he was agitated and complaining about a situation involving his uncle's caretaker. Mesler confirmed that "everybody [was] using drugs," including Appellant.

At some unspecified point, Brooks returned to the home, and Martinez came over. Lyons was not present. Mesler testified that all five individuals congregated in the living room area. Appellant was in front of the door. Brooks was seated on a loveseat coloring in his coloring book[2] and talking to Martinez, who sat across from Brooks. Mesler was "doodling" in a book while sitting in a recliner next to the loveseat, and Vanderbilt was sitting in a chair "tinkering with all this little stuff."

Appellant and Martinez were mid-conversation when Mesler overheard Appellant accuse Martinez of telling others that Appellant had been "shooting at kids . . . the week before." Mesler said that Appellant then started ranting about "how he don't shoot at kids." Appellant said, "I don't think this gun will kill you; I'll kill you with my bare hands." Mesler testified that without further provocation, Appellant intentionally pulled out a gun and shot Martinez, then Brooks, and then Martinez again before turning his gun on Mesler. Mesler attempted to cover her face and was shot in the hand, eventually losing her finger. Mesler testified that she begged Vanderbilt for her life, and Vanderbilt told Appellant to put the gun down. Before

_____

[2]In photographs admitted into evidence, gel pens can be seen on the couch along with a pack of gel pens on the floor near a bullet casing and puddle of blood.

3

Appellant obliged, Appellant instructed Mesler to blame the shooting on "Dominic." Mesler went to the hospital after Appellant left the residence.

Mesler testified that she initially told police at the hospital that the murders had been committed by an individual named Dominic because she was scared Appellant would "come back and finish it" if she did not lie as instructed. As soon as Vanderbilt left the room, however, Mesler told police it had been Appellant. Mesler could not remember what Appellant's gun looked like but noted that his gun had a transparent extended clip. On cross-examination, Mesler affirmed that she was a prostitute but denied working for Vanderbilt. She also retracted her prior statement to police that she and Appellant had been in the backroom immediately before the shooting.

Vanderbilt testified that on the evening of November 17, 2022, he, along with Mesler, and Appellant, had been at Lyons's house smoking marihuana and methamphetamine. Then, Brooks and Martinez arrived. Twenty to thirty minutes after their arrival, Appellant and Martinez began "arguing about some shooting with some little kids or some s--t." According to Vanderbilt, Martinez got up and asked Appellant: "[W]hat you gonna do? What you gonna do about it?" Appellant immediately pulled out his gun and shot Martinez before turning to Brooks and shooting him twice. According to Vanderbilt, Mesler then "started coming towards" Appellant, and Appellant shot her. Vanderbilt testified that he put his hands out in front of Appellant and said, "You did enough. . . . What [are] you doing? What's wrong with you? What's wrong, man?" Appellant appeared to "snap[] out of it," but with the gun still pointed at Mesler, he instructed Vanderbilt and Mesler to say "some dude, Dominique" had been responsible for the shooting. Like Mesler, when law enforcement first spoke with Vanderbilt at the hospital, he denied knowing who

4

had committed the shooting and then later named "Dominique," before ultimately identifying Appellant as the perpetrator.

On the morning after the shooting, Appellant visited a residence occupied by Richard Dustin Loftin. Loftin noted that Appellant had been wearing shorts, and because it was cold outside, Loftin offered Appellant a pair of pants. Appellant changed and left his shorts at the residence. Upon hearing about the shooting, Loftin turned Appellant's shorts over to police. The shorts, as well as items Appellant was wearing at the time of his arrest on November 18, 2022, were later tested and confirmed to contain gunshot residue particles consistent with the items having "been in immediate proximity of a firearm as it's being discharged," or having "come in contact with a surface that had gunshot primer residue particles."

Meanwhile, at some point within seventy-two hours after the shooting, Charles William Pool was throwing trash inside a dumpster in an alleyway behind a church "on 15th and 16th" street[3] and found a gun. Pool later showed the gun to friends, and Javiel Soliz recognized the gun as belonging to Appellant. Soliz testified that he took the gun from Pool and handed it over to law enforcement on November 20, 2022. On cross-examination, defense counsel sought to establish that Soliz was testifying against Appellant as retribution for Appellant breaking his jaw over a stolen backpack. Soliz denied the accusation and disputed Appellant's version of events.

Brent Hester, a Texas Department of Public Safety (DPS) forensic DNA analyst, testified regarding the DNA evidence found on the gun and a pair of shoes belonging to Appellant. Swabs from the grip and the textured areas of the slide of the gun, a Glock 48, 9-millimeter with "an extended clear-in-color magazine," contained a DNA profile interpreted as a mixture of four individuals with Appellant

---

[3]Lyons resided in an apartment on the corner of 16th Street.

5

and Mesler listed as possible contributors. Vanderbilt was excluded as a contributor to the DNA profile. Darrell Morgan, a DPS firearm and toolmark examiner, testified that the fired cartridge cases collected from the crime scene were all identified as having been fired from the recovered weapon. Hester testified that there was a stain on the left shoe that tested presumptively positive for the presence of blood, which was interpreted as originating from a single individual, Mesler.

As part of the investigation, Big Spring Police Department Detective Chase Clanton spoke with Mesler and Vanderbilt, as well as Meagan McBee, the individual who had dropped Appellant off at Lyons's residence that evening. McBee testified that she knew Appellant had been armed, because he had shown her the Smith & Wesson that he was carrying. On redirect examination, McBee testified that while she could have been incorrect regarding the firearm brand, she was positive that Appellant's gun had a clear magazine clip. Detectives also followed up with a known individual by the first name of Dominique but they determined that "there was no signs" he had been involved in the shooting.

On November 21, 2022, Thomas R. Parsons, M.D., a forensic pathologist, conducted autopsies on Brooks and Martinez. Dr. Parsons noted Brooks had sustained two gunshot wounds. One bullet entered through his arm, exited, reentered through his chest through his armpit, and exited again. The other bullet entered through his back and exited through his chest. Martinez had sustained four gunshot wounds, with entrances to his neck, the left side of his chest, the left side of his back, and his left arm. One projectile was recovered from Martinez's right shoulder. Dr. Parsons determined the cause of death for both men had been gunshot wounds.

At trial, Appellant testified that although he had no weapon convictions on his record, law enforcement had previously accused him of being involved in other shootings. Appellant stated that while McBee had given him a ride that evening, the

only weapon in his possession had been a Smith & Wesson that he dropped off at his uncle's house before going to Lyons's after 7:00 or 8:00 p.m. Appellant testified that he had gone over to Lyons's house to sell Vanderbilt marihuana, and once there, Mesler kept "trying to give [him] sexual favors for cash" for Vanderbilt, which Appellant declined. After "an hour or so," Vanderbilt started "doing some weird stuff" and Mesler was "walking back and forth" between the living room and bedroom. Appellant then heard a loud knock at the door. Appellant testified that Mesler went to open the door, while he retreated to the bedroom. From there, Appellant overheard a discussion about drugs and "somebody stealing something from somebody." Appellant testified that he heard cussing, followed by a thump, a scream, and five gunshots. Appellant testified that he walked out into the living room once he heard the shooter leave, and that Mesler ran up to Appellant, claiming she had been shot. Appellant said that he "put [his] hands up" and exited the residence. Appellant conceded that it was him captured on Warren's home security recording walking out of the alleyway, but he denied shooting anyone that night. Appellant further explained that he did not call the police because he was "just minding [his] business."

On cross-examination, Appellant was asked why his DNA was found on the gun. Appellant responded, "I've handled a lot of weapons, like AK-47s, 1911s, a couple -- like, probably three or four Glocks, Caniks." Appellant explained that the blood on his shoe likely occurred while trying to leave the residence, and he attributed gunshot residue on his clothes to having walked through an area where two people had just been shot. While Appellant admitted to having prior misdemeanor assault convictions and prior arrests for aggravated assault with a deadly weapon, Appellant emphasized that he uses his "hands and not weapons" in disputes.

Appellant called three witnesses: Brandee Leann Castillo, Brandy Ann Martinez (Brandy), and Cesar Rueda. Each testified that Mesler told them that Appellant did not shoot her. According to the defense witnesses, Mesler did not volunteer who the shooter was nor did any of them ask. Rueda had a criminal record and was currently incarcerated. He testified that he knew Mesler but that he had never met Appellant until they "crossed paths" while in jail. He testified broadly that Mesler told him that Appellant "wasn't the one who had, like, pulled the trigger on anybody." Brandy also had a criminal history and was incarcerated at the time of trial. She testified that she was a "long time" friend of Appellant's and that they used to date "[a] long time ago." Brandy stated that Mesler confided that she was always "infatuated and obsessed with" Appellant, and that Mesler had accused Appellant of shooting her because he would never "give [her] the time of day." Brandy testified that Mesler told her twice that Appellant did not shoot her. Castillo was also incarcerated at the time of trial, she knew both Appellant and Mesler and she testified that Mesler stated that Appellant was not the person that shot her, and that Mesler "got mad because [Castillo] and [Appellant] were writing, and [Mesler] got all jealous."

At the close of evidence, the trial court held a charge conference. Appellant requested an instruction on the lesser-included offenses of murder and manslaughter, which the trial court denied.

Then, during jury deliberation, the trial court received the following note from jurors: "We, the jury, are requesting testimony be read back. We need clarification of [Appellant's] testimony in regards to his reaction and response to someone showing up at the residence." The trial court informed the parties that the court reporter had searched the record and retrieved the excerpts, which were provided to both the State and defense counsel for approval. Neither party objected, and defense

counsel confirmed that the readback was acceptable to the defense. The jury was then brought into the courtroom, and the court reporter read aloud the following two excerpts of testimony:

THE REPORTER: There are two separate excerpts where the topic in question is addressed. I will now read the first excerpt.

QUESTION: (By [defense counsel]) Then what happened?

ANSWER: Well, just, I was there for, like, an hour or so. So just back and forth, talking, me just sitting there chilling. I didn't really operate out there or go out there that much. They were -- [Vanderbilt] was doing some weird stuff. [Mesler] was walking back and forth. I was -- this is a small area, so I was sitting in the chair. I could see out to the living room area, and we were just talking, just chilling. And then she came back in there, and we start talking again. That's when I heard a bang on the door, like, "Boom, boom, boom." And I looked out there, and I said, "Who is that?" She's like, "I don't know, let me check." So when she walked out, I shut the door because I don't want nobody knowing I'm over there. I never been over there before.

QUESTION: And when you say you shut the door, what kind of door was that?

ANSWER: It's a sliding door. I believe it has, like, a gold hole right there, and you can just slide the door and shut it. So when she went out there and opened the door, I believe I heard [Brooks's] name. He was like, "It's me, [Brooks]," and she let him in. I was like, "Okay." And then five minutes later, I believe I heard somebody else come in. It sounded like two more people. There was a lot of voices. You could tell there was, like, people talking.

QUESTION: Did you ever go out into that living room area once --

ANSWER: No, I stayed right there in that room the whole time.

*(End of first excerpt.)*

THE REPORTER: I will now read the second excerpt.

9

QUESTION: (By [the State]) You also stated that when you heard a knock on the door, that you hid in the bedroom.

ANSWER: No, I didn't hide in the bedroom. I was already in the bedroom.

QUESTION: I'm sorry. You closed the door?

ANSWER: Yeah, I closed the door.

QUESTION: Well, why don't you want people to know you're there?

ANSWER: I don't like being around people that I don't hang with, associate with, or know. I know what kind of area that is, so I kind of isolate myself. When stuff like that happens, I try to just get out the way, stay out the way. I don't like being around people. I got haters. People gossip and lie and hate on me all the time for no reason.

*(End of second excerpt.)*

The jury found Appellant guilty as charged in the indictments.

## II. *Sufficiency of the Evidence*

Appellant argues in his third issue, which we address first, that the evidence is insufficient to support his conviction for capital murder.

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762 ("[A] reviewing court does not sit as the thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Garcia*, 667 S.W.3d at 761. Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762.

We treat direct and circumstantial evidence equally under this standard. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Lee*, 676 S.W.3d at 915. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446,

448 (Tex. Crim. App. 2015). Rather, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Identity is an essential element of any criminal offense. *Solis v. State*, 726 S.W.3d 394, 403–04 (Tex. Crim. App. 2025); *Ruiz*, 631 S.W.3d at 850–52. "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018).

We measure the sufficiency of the evidence by comparing the evidence produced at trial against "the elements of the offense as defined by the hypothetically correct jury charge." *Turley v. State*, 691 S.W.3d 612, 617 (Tex. Crim. App. 2024); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Turley*, 691 S.W.3d at 617 (citing *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). "The law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations." *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024).

As charged in this case, the State was required to prove beyond a reasonable doubt that (1) Appellant (2) intentionally or knowingly (3) caused the death of (4) more than one individual. PENAL §§ 19.02(b)(1), 19.03(a)(7).

Appellant contends that the evidence is insufficient to support his conviction for capital murder because (1) the State failed to show that he possessed the firearm, utilized the firearm, or shot Martinez or Brooks; (2) the only "eyewitness" accounts came from Mesler and Vanderbilt, who admitted to using multiple controlled

12

substances at the time of the shooting and who provided contradictory statements; (3) he was unfairly targeted by law enforcement; and (4) he lacked a motive to commit the shooting. In other words, Appellant challenges the element of identity—i.e., whether a rational trier of fact could have found beyond a reasonable doubt that he was the person who intentionally or knowingly caused Brooks's and Martinez's deaths. *See Bogany v. State*, No. 11-24-00068-CR, 2025 WL 1829561, at *2 (Tex. App.—Eastland July 3, 2025, no pet.) (mem. op., not designated for publication). Contrary to Appellant's arguments, we conclude that the evidence adduced at trial is sufficient to support Appellant's conviction for capital murder. Mesler's and Vanderbilt's testimony served as direct evidence of Appellant's identity as the shooter, as both explicitly identified Appellant as the perpetrator at trial. There was also evidence of opportunity, insofar as the murders occurred when Appellant was present in the residence—a fact which Appellant does not dispute and which is further corroborated by footage of Appellant leaving the area immediately after the shooting. *See Ingerson*, 559 S.W.3d at 510 (concluding that the circumstantial evidence was sufficient to support a conviction for capital murder because the defendant had the opportunity and means of killing the two victims). Additional circumstantial evidence included testimony from four witnesses that Appellant carried a gun with an extended clear or transparent clip magazine, which matched the description of the recovered gun. Appellant could not be excluded as a contributor to the DNA profile found on the murder weapon. And gunshot residue was also found on Appellant's clothes worn at the time of his arrest and on the shorts handed over to police by Appellant's friend.

Appellant denied his involvement in the shooting, provided explanations for why his DNA was found on the murder weapon—"I'm pretty sure I probably handled that weapon"—and why gunshot residue was found on his clothes—"it's a

possibility [the blood] could have got [sic] on my shoe"—when he walked out of the house—and claimed that he was being unfairly targeted by law enforcement. However, our standard requires that we "defer to the credibility and weight determinations of the jury because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony." *See Joe v. State*, 726 S.W.3d 482, 486 (Tex. Crim. App. 2025). It was within the jury's providence to believe all, some, or none of the testimony presented at trial, including that from Mesler, who described the event and identified Appellant as the shooter. *Garcia*, 667 S.W.3d at 762.

With respect to Appellant's contention that there was an absence of evidence indicating a motive on his part, the State was not required to prove motive to sustain Appellant's capital murder conviction. *See Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) ("[I]t is not required that the State show a motive in order to sustain a conviction of capital murder."); *DeLeon v. State*, 77 S.W.3d 300, 312–13 (Tex. App.—Austin, 2001 pet. ref'd). Moreover, Mesler's and Vanderbilt's testimony that Appellant engaged in a verbal dispute with one of the victims shortly before Appellant began shooting impugns Appellant's claim of an absence of evidence of motive.

The record reflects that the State presented a range of evidence at trial that, taken together, supports the jury's finding that Appellant was the perpetrator of the offense. We therefore conclude that the evidence, as measured against a hypothetically correct jury charge and considered in the light most favorable to the verdict, was sufficient to support Appellant's conviction for capital murder. *See Turley*, 691 S.W.3d at 617. We overrule Appellant's third issue.

### III. *Lesser-Included Offense Instructions*

In his first issue, Appellant contends that the trial court erred by refusing his requested jury instruction on the lesser-included offenses of manslaughter and murder.

Appellate courts use a two-step analysis to determine if a defendant is entitled to a charge on a lesser offense. *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018). "First, we compare the statutory elements of the alleged lesser offense and the statutory elements and any descriptive averments in the indictment." *Id.* at 670–71 (citing *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016)). Under this first step of the analysis, an offense is a lesser-included offense if it is within the proof necessary to establish the offense charged. *Bullock*, 509 S.W.3d at 924.

Under the second step, there must be some evidence in the record establishing that, if the defendant is guilty, he is guilty only of the lesser offense. *Wade v. State*, 663 S.W.3d 175, 181 (Tex. Crim. App. 2022). The second prong "is satisfied only if 'there is evidence which, if believed, refutes or negates every theory which elevates the offense from the lesser to the greater.'" *Ransier v. State*, 670 S.W.3d 646, 650 (Tex. Crim. App. 2023) (quoting *Ritcherson*, 568 S.W.3d at 671). "In other words, the evidence must establish that the lesser-included offense provides the jury with 'a valid, rational alternative to the charged offense.'" *Wade*, 663 S.W.3d at 181 (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)). "[I]f more than a scintilla of evidence, from any source, raises the issue that the defendant was guilty only of the lesser offense, then the defendant is entitled to an instruction on the lesser offense." *Id.*

As a matter of law, manslaughter and murder are lesser-included offenses of capital murder. *See Green v. State*, 713 S.W.3d 865, 875 (Tex. Crim. App. 2025)

(murder); *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000) (noting that the Court of Criminal Appeals has recognized manslaughter as a "lesser-included offense[] of murder, and therefore, of capital murder" (citing *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999)))); *Moore v. State*, 969 S.W.2d 4, 9–10 (Tex. Crim. App. 1998). As such, the only issue for our consideration is the second prong—whether there was any evidence presented at trial from which a rational jury could have found that Appellant is guilty only of the lesser-included offenses of manslaughter or murder. *See Ransier*, 670 S.W.3d at 650.

The difference between murder and manslaughter is the culpable mental state, intent versus recklessness. *Cavazos v. State*, 382 S.W.3d 384 (Tex. Crim. App. 2012); *compare* PENAL § 19.04(a) (stating that a person commits manslaughter if he recklessly causes the death of an individual), *with id.* § 19.02(b)(1) (providing that a person commits murder if he intentionally or knowingly causes the death of an individual). A person commits manslaughter by recklessly causing the death of an individual, which is acting with a conscious disregard of a substantial and unjustifiable risk regarding circumstances or results surrounding the conduct. *Cavazos*, 382 S.W.3d at 384; *see* PENAL § 6.03(c) (West 2021), § 19.04(a). For Appellant to be entitled to the lesser-included-offense charge of manslaughter, there must be evidence presented that manslaughter was a "valid, rational alternative" to murder. *See Cavazos*, 382 S.W.3d at 385 (quoting *Hall*, 225 S.W.3d at 536).

Meanwhile, as relevant here, Section 19.03(a)(7) provides that a person commits capital murder if the person commits murder, as defined under Section 19.02(b)(1) (intentionally or knowingly causing the death of an individual), and the person intentionally commits the murders of more than one person during the same criminal transaction. PENAL § 19.03(a)(7). Thus, with respect to the

16

applicability of the lesser included offense of murder, there must be evidence that Appellant committed *only one* murder—not two. *See id.*

Appellant argues that because (1) Mesler and Vanderbilt changed their story on multiple occasions, and (2) there was evidence that Mesler was a contributor to the DNA profile mixture on the firearm, this was some evidence that Appellant "was guilty of shooting only one person at the residence or, in the alternative, that he shot Martinez as a result of provocation (based on Vanderbilt's testimony of an altercation)." We disagree. That Appellant may have been provoked by Martinez, even if true, is not evidence of a substantial and unjustifiable risk, of which Appellant was aware but disregarded, in discharging the gun at each victim, multiple times, resulting in Brooks's and Martinez's deaths (i.e., manslaughter). *See* PENAL § 19.04(a); *Ritcherson*, 568 S.W.3d at 678 (stabbing a victim multiple times due to alleged provocation is no evidence that appellant did not intentionally or knowingly act with the intent to kill or cause serious bodily harm). And Appellant did not testify to shooting anyone—accidentally, with provocation, or otherwise. There is no reasonable interpretation of the evidence that would allow a factfinder to infer or rationally find that Appellant acted only recklessly in the shooting. *See Ritcherson*, 568 S.W.3d at 677–78.

Nor is it evidence that Appellant was responsible for intentionally or knowingly causing the shooting death of just Brooks or just Martinez (i.e., murder). *See* PENAL § 19.02(b)(1). Appellant further posits that the "jury could also have rationally inferred that even if [he] meant to shoot Martinez as per the altercation Vanderbilt described, his shooting of Brooks was not intentional and was accidental after shooting Martinez." We examine the record and cannot "pluck[] certain evidence from the record and examine it in a vacuum." *Ritcherson*, at 677–68 (quoting *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000)). Contrary

to Appellant's assertion on appeal, both Mesler and Vanderbilt unequivocally testified that Appellant acted purposefully, not accidentally, when he shot both Martinez and Brooks. Given the number of shots fired into the victims, neither the other evidence of Mesler being one of multiple DNA contributors to the DNA profile on the firearm nor Vanderbilt's mention of an altercation negates the physical evidence showing Appellant's intent to kill both Martinez and Brooks. *See Cardenas*, 30 S.W.3d at 393.

The Court of Criminal Appeals is clear: "[T]he mere disbelief of evidence establishing commission of the greater offense is insufficient by itself to justify submission of a [lesser included offense] instruction." *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023). Appellant's entire argument presupposes that the jury disbelieved the State's evidence and requires the application of inferences unsupported by evidence at trial. *See Green*, 713 S.W.3d at 876. Because there was no evidence that raised the issue of the lesser-included offense of manslaughter or non-capital murder, the trial court did not err in declining to submit either lesser-included offense instruction to the jury. *See Chavez*, 666 S.W.3d at 777 ("[I]f the defendant presents evidence that he committed no offense at all . . . or if he presents no evidence . . . , and there is no evidence otherwise raising the issue, a charge on [a] lesser offense . . . is not required." (quoting *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985))). We overrule Appellant's first issue.

IV. *Article 36.28*

In Appellant's second issue, he argues that the trial court's "handling of jury questions during deliberations lacked necessary safeguards for reading back jury testimony." *See* CRIM PROC. art. 36.28 (West 2006).

Article 36.28 of the Code of Criminal Procedure allows evidence to be read back to the jury "if the jury disagree as to the statement of any witness." *Id.*

Article 36.28 "seeks to balance the concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have." *Balderas v. State*, 517 S.W.3d 756, 797 (Tex. Crim. App. 2016). In other words, "[t]he statute provides a precondition for reading back testimony—a jury dispute ('if the jury disagree')." *Stredic v. State*, 663 S.W.3d 646, 654 (Tex. Crim. App. 2022). However, "Article 36.28 does not require that the jury use any particular words to express its disagreement," and "[w]hether a disagreement exists will depend upon the particular facts of each case." *Balderas*, 517 S.W.3d at 798. Only when a trial court has determined that the request is proper under Article 36.28, must it "interpret the communication; decide, in its discretion what sections of the testimony will best answer the query; and limit the testimony accordingly." *Id.* "Complaints about error in the reading of trial testimony must be preserved by objection at the time of the reading." *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016).

"An appellate court should not disturb a trial court judge's decision under Article 36.28 unless a clear abuse of discretion and harm are shown." *Id.* at 923. A trial court abuses its discretion where it acts without reference to guiding rules or principles. *Moody v. State*, 543 S.W.3d 309, 312–13 (Tex. App.—Eastland 2017, pet. ref'd).

Here, the trial court received a note from the jury requesting clarification of Appellant's testimony. The trial court did not, however, further inquire to establish how a disagreement might be present. *Cf. Stredic*, 663 S.W.3d at 654. Nevertheless, with approval from the State and Appellant, the trial court directed the court reporter to locate and then read several pages of testimony. Appellant now argues that we should find that preservation of error is not required when, like here, the trial court fails to engage in further inquiry under Article 36.28 and the defendant fails to

19

object. No authority supports such a position. Rather, the caselaw provides that a defendant must preserve a complaint that the trial court failed to comply with Article 36.28. *Thomas*, 505 S.W.3d at 924; *Rodriguez v. State*, No. 08-16-00118-CR, 2018 WL 3372637, at *13 (Tex. App.—El Paso July 11, 2018, pet. ref'd) (not designated for publication) ("A trial court's failure to follow the correct procedures under the Code of Criminal Procedure in responding to a jury's communication is an easily rectifiable or curable error, and therefore it is incumbent upon the defendant to come forth with a timely objection to the trial court's failure to follow those procedures."); *Perez v. State*, No. 11-09-00137-CR, 2010 WL 5023213, at *4 (Tex. App.—Eastland Dec. 9, 2010, no pet.) (mem. op., not designated for publication) (concluding appellant failed to make any objection to the reading of testimony and therefore did not preserve his Article 36.28 complaint on appeal).

Because Appellant failed to lodge a timely objection at trial, instead agreeing with the trial court's proposal, his Article 36.28 complaint on appeal was not preserved for our review. Appellant's second issue is overruled.

## V. *This Court's Ruling*

We affirm the judgments of the trial court.


W. BRUCE WILLIAMS

JUSTICE


May 8, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.